IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CV-363-D

| | | |
|---|---|---|
| THRESEA DONALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| NOVANT HEALTH, INC., | ) | |
| THE PRESBYTERIAN HOSPITAL, | ) | |
| d/b/a NOVANT HEALTH PRESBYTERIAN | ) | |
| MEDICAL CENTER, and | ) | |
| NOVANT HEALTH ROWAN | ) | |
| MEDICAL CENTER, LLC | ) | |
| | ) | |
| Defendants. | ) | |

On December 20, 2023, Thresea Donald ("Donald" or "plaintiff") filed an amended complaint against Novant Health, Inc. ("Novant"), The Presbyterian Hospital, d/b/a Novant Health Presbyterian Medical Center ("Presbyterian"), and Novant Health Rowan Medical Center, LLC ("Rowan") (collectively, "defendants") [D.E. 40, 46]. Donald alleges (1) retaliation in violation of 42 U.S.C. § 1981 (count one); (2) race discrimination in violation of 42 U.S.C. § 1981 (count two); and (3) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621 et seq. (count three) [D.E. 40] ¶¶ 57–96.

On January 31, 2025, defendants moved for summary judgment [D.E. 87] and filed a memorandum in support [D.E. 90], a statement of material facts [D.E. 88] and an appendix [D.E. 89]. On February 20, 2025, Donald responded to defendants' motion for summary judgment [D.E.

92], and filed a response to defendants' statement of material facts [D.E. 93][1] and an appendix [D.E. 94].

On March 5, 2025, defendants replied to Donald's statement of material facts [D.E. 95] and Donald's response in opposition to defendants' motion for summary judgment [D.E. 97]. On March 10, 2025, Donald filed a surreply [D.E. 98]. On March 18, 2025, defendants moved to strike Donald's surreply [D.E. 99].

On March 31, 2025, defendants moved for extension of time to take Donald's damages expert's deposition [D.E. 102]. On that day, Donald filed objections to Magistrate Judge Kimberly A. Swank's recommendations about various discovery orders [D.E. 104] and filed a response in opposition to defendants' motion to strike Donald's surreply [D.E. 105].

On April 28, 2025, Donald filed a motion to withdraw Donald's reply to defendants' opposition to Donald's objections to the magistrate's order and moved for leave to file a reply [D.E. 111]. As explained below, the court grants defendants' motion for summary judgment and denies as moot the parties' other motions.

## I.

Donald is an African-American woman over age 40. Pl.'s Statement of Additional Facts [D.E. 93] ¶ 1. Donald worked as the anatomic pathology supervisor ("AP Supervisor") at Novant's

---

[1] Docket entry 93 consists of Donald's response to defendants' statement of material facts, and a statement of additional facts. A party's statement of material facts is "deemed admitted for the purposes of the motion [for summary judgment] unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement" that is "followed by a citation to [admissible] evidence." Local Civ. R. 56.1(a)(2), (a)(4); see Williamson v. Bridgestone Ams., Inc., 625 F. Supp. 3d 466, 470–71 (E.D.N.C. 2022); Felton v. Moneysworth Linen Serv., Inc., 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017). Donald's response provides citations only in some paragraphs. Thus, Donald has admitted the facts contained in the remaining paragraphs of Novant's statement.

2

Anatomic Pathology Laboratory ("AP Lab") at Rowan Medical Center ("RMC") in Salisbury, North Carolina. See Defs.' Statement of Material Facts ("DSMF") [D.E. 88] ¶ 2. Donald began work in the AP Lab on June 5, 2017. See id. Novant employed Donald as an at-will employee. See id. at ¶ 10.

When Novant hired Donald, the AP Lab had five members: an administrative employee, Donald, and three histology technologists. See id. at ¶ 24. Histology technologists "have a two-year degree or are job-trained and they cut tissue and embed tissue," while cytology technologists "read slides and review slides for cancer and normally are four-year degreed employees." See id. at ¶¶ 25–28. The cytology technologists and the histology technologists in the AP Lab were not cross trained. See id. at ¶ 30. Donald's expertise is in cytology. See id. at ¶ 29. Donald received a certificate in cytotechnology from Johns Hopkins University and has never worked as a histology technologist. See id. at ¶¶ 5, 29.

As the AP Lab Supervisor, Donald "perform[ed] all laboratory procedures, including quality control, specimen collection, processing, testing, and reporting of lab results," and oversaw laboratory personnel and daily workload. See id. at ¶¶ 6–7. Donald, as the AP Lab's only cytology technologist, oversaw cytology screening. See id. at ¶¶ 7–8. Cytology screening consisted of "writing and revising policies and procedures for the department, and accession processing and microscopic evaluation of non-GYN cytology specimens." See id.

When Donald began at RMC, Novant contracted to receive managerial support from other entities, including Labcorp. See id. at ¶ 18. Christine Stiller ("Stiller"), a white Labcorp employee, served as Novant's Clinical Laboratory Manager. See id. at ¶ 19. Donald reported to Stiller from Donald's hire in June 2017 until October 2019. See id. at ¶ 23. Stiller reported to Stefanie Schray ("Schray"), a white Labcorp employee, who served as the Laboratory Director for the geographic

3

region which encompassed RMC until 2019. See id. at ¶ 20. Schray reported to Tara Williams ("Williams"), an African-American Labcorp employee, who was employed as the "System Director/General Manager" for Novant's clinical laboratories systemwide until August 2019." Id. at ¶ 21. Novant also contracted with Dr. Rachel Ross ("Ross"), a white pathologist from nearby Rowan Pathology Associates, to serve as the Medical Director of Novant's clinical laboratories. See id. at ¶ 22. Ross worked at RMC. See id.

In February 2018, Donald requested a transfer to Novant's Mint Hill Medical Center. See id. at ¶ 32. Although Donald told Novant that the purpose of her transfer request was to move closer to her family, Donald asserts she requested the transfer to "remove herself from a hostile work environment, but did not want her future employer to know." Compare id. at ¶ 31, with Pl.'s Response to Defs.' Statement of Material Facts [D.E. 93] ¶ 31.

In April 2018, Ross "yelled" at Donald, but Donald did not believe there was anything racial about the incident. See DSMF ¶¶ 40–42; Donald Dep. [D.E. 89-1] 49. Donald orally reported the incident to Stiller and Schray, and her reports did not concern race. See DSMF ¶¶ 43–44. On July 3, 2018, Donald filed a formal complaint about the incident with Ross. See id. at ¶ 47. Donald's formal complaint included Stiller's response to her oral complaint. See id.

Donald's formal complaint did not mention race. See DSMF ¶ 48; [D.E. 89-1] 155–57. Kim Hailey ("Hailey"), an African-American employee relations consultant at Novant, reviewed Donald's formal complaint. See DSMF ¶ 50. As part of the investigation, Hailey spoke with Donald, and Donald completed an investigation form. See id. at ¶ 57. Novant did not find any evidence of retaliation and determined that Donald struggled "with team and peer communication." Id. at ¶¶ 58–59.

4

On June 18, 2018, Novant gave Donald a "[p]erformance [a]ction [p]lan" for "deficiencies in her leadership and communication skills." See id. at ¶ 33 (quotation omitted). The plan noted that Donald "falls short with people to people engagement and motivation" but praised Donald's competency in her other responsibilities. See id. Also in June 2018, Stiller gave Donald an annual evaluation for her first year at Novant, which reiterated Donald's communication issues. See id. at ¶¶ 37–38.

On September 7, 2018, Williams placed Donald on a 30-day performance improvement plan. Id. at ¶ 60. The plan sought to correct Donald's communication issues and required Donald to take a course entitled "Leading with Emotional Intelligence." Id. at ¶¶ 62–63. On October 25, 2018, Donald completed the performance improvement plan. See id. at ¶ 64. In October 2018, Donald told Stiller that someone slashed Donald's tires at Donald's apartment complex and Donald speculated to Hailey that someone from Novant may have been involved. See id. at ¶¶ 66–67. On June 28, 2019, Donald received an Annual Manager Evaluation from Stiller which noted Donald's continuing communication issues. See id. at ¶ 68.

Beginning in March 2019, Donald began applying for positions at other healthcare employers because of a lack of work at the AP Lab. See id. at ¶¶ 76–80, 87–93. In August 2019, Donald wrote to a friend that "[RMC] is one of the smallest [hospitals] and has very little specimens . . . . I may have to retire early." Id. at ¶ 80.

In 2019, Novant changed RMC's management structure. Before 2019, RMC's geographic market was Charlotte, and Schray, the region's Laboratory Director, managed it. See id. at ¶ 94. In October 2019, Angella Callwood ("Callwood"), an African-American Labcorp employee, began as the Laboratory Director for the Winston-Salem region and RMC became a part of that market. See id. at ¶¶ 97–98. When Novant interviewed Donald in 2017, Callwood recommended Donald

be hired for the AP Lab Supervisor position. See id. at ¶ 4. Ashley Faust ("Faust"), a white Novant employee, replaced Stiller as the AP Lab's Manager, and Donald reported to Faust. See id. at ¶¶ 99–100. Faust reported to Callwood. See id. at ¶ 99.

When Callwood became the Laboratory Director responsible for RMC, she noticed declining cytotechnology case volumes at RMC. See id. at ¶ 147. As 2020 began, cytotechnology case volumes continued to decline. See id. at ¶¶ 151–53. In March 2020, Ross passed away and the three remaining pathologists at Rowan Pathology Associates eventually left the practice, leading to its dissolution. See id. at ¶¶ 154–56, 201. The AP Lab lacked a pathologist to read the pathology specimens without a local pathology practice, which contributed to decreased volumes. See id. at ¶ 158.

Beginning in March 2020 and continuing into the summer, the COVID pandemic caused a decrease in hospital operations at RMC and an ensuing decrease in case volumes at the AP Lab. See id. at ¶¶ 158–60. When Novant hired Donald in 2017, Donald reviewed between five to ten slides per day. See id. at ¶ 185. By 2020, Donald reviewed only two to four slides per day. See id. Between March 18, 2020, and March 27, 2020, cytotechnology case volumes decreased by 40 percent. See id. at ¶ 102; [D.E. 89-1] 31. By April and May 2020, Donald's case load had fallen from 2-3 "fine needle aspirations" per week in December 2019 to "one, if any, per week." See DSMF ¶ 104.

Donald and Faust worked together to plan cuts in AP Lab members' hours, which led to a 10-hour per week reduction for each AP Lab team member. See id. at ¶¶ 105–08. The workload and productivity levels at RMC and the AP Lab continued to decrease after the initial reduction in work hours. See id. at ¶¶ 109–11. On April 30, 2020, Faust informed Donald that Novant required

6

that Faust and Donald each take one paid-time-off day per week for the months of May and June. See id. at ¶ 112.

On April 1, 2020, Stiller sent an email to update various other teams at RMC which included a cartoon "Joke of the day." Id. at ¶¶ 112, 117. Stiller did not send the email to Donald or the AP Lab team. See id. at ¶ 118–19. The cartoon depicts three men standing on a gallows platform in a western setting. See id. at ¶ 121; [D.E. 89-11] 3. One white man is wearing a cowboy hat and cowboy boots. See DSMF ¶ 121; [D.E. 89-11] 3. Another white man is wearing jeans and cowboy boots. See DSMF ¶ 121; [D.E. 89-11] 3. A third white man is dressed as an executioner. See DSMF ¶ 121; [D.E. 89-11] 3. A fourth white man has a noose around his neck and is in the air. See DSMF ¶ 121; [D.E. 89-11] 3. Below the man in the air is an open trap door with a trampoline. See DSMF ¶ 121; [D.E. 89-11] 3. The shading of the cartoon suggests that the man in the air had dropped through the trap door and sprung off the trampoline. See DSMF ¶ 121; [D.E. 89-11] 3. The three men on the gallows platform are depicted laughing at the man in the air. See DSMF ¶ 121; [D.E. 89-11] 3. None of the men in the cartoon are African-American. See DSMF ¶ 121; [D.E. 89-11] 3. "April Fools!" is written underneath the cartoon. See [D.E. 89-11] 3.

Donald saw the cartoon when an African-American subordinate in the AP Lab brought it to her attention and told Donald "people were upset." See DSMF ¶¶ 122–24. A white histotechnologist told Donald that he did not consider the email racist because "the guy with the noose around his neck is not black." Id. at ¶ 124.

On April 2, 2020, Donald sent an email to Sheena Boyd, a supervisor in Novant's employee relations department. See id. at ¶¶ 53, 127; Pl.'s Reply Statement of Additional Facts [D.E. 93] ¶ 6. In the email Donald wrote "[i]s this racist or do I just not have a sense of humor??? One of my

white team members who thought it was extremely funny said 'Oh no, it's not racism because the person with the noose around their neck is not black.'" See id. at ¶¶ 53, 127 (emphasis omitted).

Donald also wrote in the email to Boyd:

> I am guessing that some may say this Novant Health Manger is just ignorant, or she lacks good judgment, or that she just has no regard for professionalism in the workplace –but I refuse to believe that she knows absolutely nothing about the history of lynching in the south; that it was part of the white supremacist uprising after the Civil War; that it took so many black lives; that it is a symbol of HATE . . . . Can someone please explain to this woman that lynching is NOT a joke!!!!

Id. at ¶ 127.   At her deposition, Donald testified that she felt the cartoon was racist and inappropriate because of the noose's symbolism.   See Donald Dep. 34–35.

When Boyd received Donald's email, she sent the email to Hailey for investigation.   See DSMF at ¶ 139.   Hailey forwarded the email to Callwood.   See id. at ¶ 140–41.   Hailey also emailed Donald to thank her for bringing the cartoon to her attention and "informed [Donald] that she had forwarded the complaint to Callwood to investigate and resolve the issue."   Id. at ¶ 141.   Callwood spoke with Stiller about the cartoon and gave her a "verbal coaching."   See id. at ¶ 144.   On April 9, 2020, Callwood prepared a "Leader/Department Investigation of Employee Complaint Form" in which Callwood summarized her conversation with Stiller.   See id. at ¶ 145.   Callwood wrote that Stiller "underst[ands] how this [cartoon] could be considered offensive. . . . It was bad judgment on her part.  [Callwood] explained to [Stiller] this is where your [d]iversity training is very valuable."   Id.

In May 2020, the workload at RMC continued to decline.   See id. at ¶¶ 113–14.   On May 13, 2020, Callwood and Faust contacted Hailey to discuss the elimination of Donald's position. See id. at ¶ 167.   Specifically, Callwood noted that "volume at RMC really can't support a full time [c]ytotech."   Id.

8

Callwood and Faust wrote a written summary of their decisionmaking. See id. at ¶¶ 167–69. In preparing the summary, Callwood and Faust reviewed productivity statistics for the AP Lab supervisor position, including cytology volume for the end of 2019 and into 2020. See id. at ¶ 170. Callwood and Faust drafted the written summary and sent it to Eric Henry ("Henry"), an African-American senior vice president at Novant, who had final authority to approve the written summary to eliminate Donald's position. See id. at ¶¶ 171–72. Henry approved the written summary. See id. at ¶ 171. The written summary was sent to the employee relations department and verified. See id. at ¶¶ 172, 174. Because of Donald's history of complaints to employee relations, leadership within the employee relations and human resources departments reviewed the written summary. See id. at ¶ 175. The written summary justified eliminating Donald's position because the declining cytology case volumes at RMC did not "warrant a full-time cytotechnologist" and the slides that Donald reviewed could "be sent to [Forsyth Medical Center] [("FMC")] for screening and returned to FMC with minimal impact to workflow." Id. at ¶ 179. The report also incorporated other statistics showing the AP Lab's lack of workload. See id. at ¶¶ 181–88. Novant leadership approved the written summary. See id. at ¶ 189. In a letter dated June 18, 2020, Novant informed Donald that it had eliminated her position. See [D.E. 89-1] 314.

After Novant eliminated Donald's position, Faust absorbed Donald's supervisory responsibilities. See id. at ¶ 205. Eventually, Novant closed the AP Lab at RMC and transferred its workload to the AP Lab at FMC. See id. at ¶ 208.

On June 27, 2020, Donald applied for the AP Supervisor position at Presbyterian Medical Center ("PMC") in Charlotte, North Carolina. See DSMF ¶ 212; [D.E. 89-1] 433. Jeanie Hollar ("Hollar"), the anatomic pathology manager at PMC, served as the hiring manager for the role. See DSMF ¶ 214. Novant promoted Hollar to serve as Novant's Laboratory Regional Manager.

9

See id. at ¶ 214. Because of Hollar's promotion, Novant sought to fill the anatomic pathology manager position first before hiring an anatomic pathology supervisor. See id. at ¶¶ 215–16. In August 2020, Novant hired Montello as the anatomic pathology manager at PMC. See id. at ¶ 216. Montello's background is in cytology. See id. at ¶ 218. Hollar sought to hire an anatomic supervisor a candidate with a histology background to complement Montello's background. See id.

Of 36 applicants for the AP Supervisor position, Novant selected Donald, Robert Pavelik ("Pavelik"), and Jeff Moore ("Moore") to interview. See id. at ¶ 220. Donald, Pavelik, and Moore each had experience at Novant. See id. In January 2021, Hollar and Montello hired Pavelik for the position. See id. at ¶ 222. Pavelik "self-identifies as multi-racial, including Asian, Native Hawaiian/Other Pacific Islander and White." Id. at ¶ 223. At the time of his hire, Pavelik was 35 years old. See id. Pavelik possesses a histology background. See id. at ¶ 225. Donald's interview feedback summary prepared by Novant stated "don't hire . . . experience was in a low volume setting. Skills relevant to histology are not strong." Id. at ¶ 228. When Hollar and Montello decided to hire Pavelik, neither Hollar nor Montello knew about Donald's prior complaints. See id. at ¶ 238. On April 28, 2021, Donald filed a charge of discrimination with the EEOC alleging race, color, and age discrimination, and retaliation for Novant's failure to hire her for the PMC AP Supervisor position. See id. at ¶ 240; [D.E. 89-1] 444–47.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary

10

judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

A.

Section 1981 prohibits race discrimination and retaliation in contracting. See 42 U.S.C. § 1981; CBOCS W., Inc. v. Humphries, 553 U.S. 442, 446–57 (2008) (holding that section 1981 encompasses retaliation claims). Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 "protects all persons from

racial discrimination in making and enforcing contracts." Woods v. City of Greensboro, 855 F.3d 639, 645 (4th Cir. 2017).

A plaintiff may establish a race discrimination or retaliation claim in two ways. First, a plaintiff can use direct evidence to show that race discrimination or retaliation motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins., 416 F.3d 310, 318 (4th Cir. 2005). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013) (cleaned up); see Johnson v. United Parcel Serv., Inc., 839 F. App'x 781, 793 (4th Cir. 2021) (per curiam) (unpublished); Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). Alternatively, if a plaintiff lacks direct evidence of race discrimination or retaliation (as in this case), a plaintiff can proceed under the McDonnell Douglas burden-shifting framework. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Gross, 557 U.S. 167.[2] The McDonnell Douglas framework consists of three steps: "(1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Invs.,

_____

[2] Donald's brief in opposition to summary judgment asserts that Donald possesses direct evidence of race discrimination and retaliation. The cited materials, however, do not reflect directly defendants' alleged racial or retaliatory attitude. See [D.E. 92] 7–10. Accordingly, Donald must proceed under the McDonnell Douglas framework.

12

LLC, 828 F.3d 208, 216 (4th Cir. 2016). The McDonnell Douglas framework applies to retaliation and race discrimination claims under section 1981. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 430 & n.3 (4th Cir. 2004); Beall v. Abbott Lab'ys, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam v. S.C. Dep't of Juv. Just., 474 F.3d 134 (4th Cir. 2007).

If a plaintiff establishes a prima facie case, the burden shifts to "the employer to rebut the presumption of retaliation by articulating a legitimate[,] nonretaliatory reason for its actions." Beall, 130 F.3d at 619; see Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). "Once an employer articulates a reason for discharging the plaintiff not forbidden by law, [the court does] not evaluate whether the reason was wise, fair, or even correct." Wannamaker-Amos v. Purem Novi, Inc., 126 F.4th 244, 257 (4th Cir. 2025) (quotation omitted); see Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 901 (4th Cir. 2017); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142–43 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted), abrogated in part on other grounds by Gross, 557 U.S. 167; see Reeves, 530 U.S. at 147. The plaintiff, however, "cannot survive summary judgment by

13

focusing on minor discrepancies that do not cast doubt on the explanation's validity or by raising irrelevant points." Fitzgerald v. Botetourt Cnty., No. 22-1081, 2024 WL 4579401, at *3 (4th Cir. Oct. 25, 2024) (unpublished) (quotation omitted); see Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006).

1.

In count one, Donald alleges defendants retaliated against Donald for her April 2, 2020, complaint about Stiller's email when Novant eliminated the AP Lab Supervisor position at RMC on June 18, 2020. Donald also alleges defendants retaliated against her in January 2021 when Novant did not hire Donald for the AP Lab Supervisor position at PMC.

Section 1981 prohibits retaliation for complaints about race discrimination. See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 331–32 (2020); Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 354–55 (2013); CBOCS W., Inc., 553 U.S. at 452–57. To state a prima facie case of retaliation under section 1981, the plaintiff must show that (1) she engaged in protected activity, (2) the employer took an action against her that a reasonable employee would find materially adverse, and (3) a causal connection existed between the protected activity and the adverse employment action.[3] See DeCoster v. Becerra, 119 F.4th 332, 342 (4th Cir. 2024); Laurent-Workman v. Wormuth, 54 F.4th 201, 218 (4th Cir. 2022); DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015); Boyer-Liberto, 786 F.3d at 281; Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003); Spriggs

---

[3] The elements of a prima facie case of retaliation under section 1981 are the same as a Title VII retaliation claim. See, e.g., Guessous, 828 F.3d at 218; Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 & n.5 (4th Cir. 2015). Accordingly, the court cites cases applying both statutes.

14

v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001); Brown v. Goodwill Indus. of E. N.C., Inc., No. 4:17-CV-144, 2018 WL 2422315, at *2 (E.D.N.C. May 29, 2018) (unpublished); Johnson v. Pitt Cnty. Bd. of Educ., No. 4:16-CV-214, 2017 WL 2304211, at *12 (E.D.N.C. May 25, 2017) (unpublished); see also Nassar, 570 U.S. 338 at 362–63; Burlington N. & Santa Fe. Ry. v. White, 548 U.S. 53, 67–70 (2006).

"To establish a causal relationship between the protected activity and the [adverse action], a plaintiff must show that the decision maker was aware of the protected activity at the time the alleged retaliation occurred." Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 124 (4th Cir. 2021). An employee cannot demonstrate a causal connection between protected activity and the employer's adverse action without alleging that the decisionmaker who took the adverse action knew that the employee had engaged in protected activity. See Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998), abrogated on other grounds by White, 548 U.S. 53; see also Conrad v. CSX Transp., Inc., 824 F.3d 103, 108 (4th Cir. 2016); Gestamp S.C., L.L.C. v. NLRB, 769 F.3d 254, 261–62 (4th Cir. 2014).

Courts also consider the temporal proximity between an employer's knowledge of protected activity and an adverse action. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004), abrogated on other grounds by Nassar, 570 U.S. 338. An adverse action taken shortly after an employer learned of protected activity typically permits a reasonable inference of causation. See, e.g., Massaro v. Fairfax Cnty., 95 F.4th 895, 902–03 (4th Cir. 2024); Dowe, 145 F.3d at 657. "A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, [however,] . . . negates any inference that a causal connection exists between

15

the two." Dowe, 145 F.3d at 657 (finding three years too long to infer causation); see Breeden, 532 U.S. at 274 (same for 20 months); Barnhill v. Bondi, 138 F.4th 123, 132–35 (4th Cir. 2025) (same for six months); Cosby v. S.C. Prob., Parole & Pardon Servs., 93 F.4th 707, 721–22 (4th Cir. 2024) (same for six years); Massaro, 95 F.4th at 902 (same for 18 months); Roberts, 998 F.3d at 126 (same for three months); Penley v. McDowell Cnty. Bd. of Ed., 876 F.3d 646, 656 (4th Cir. 2017) (same for eight and nine months); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (same for 13 months); Colley v. ISS Facility Servs., Inc., No. 24-1320, 2025 WL 1743498, at *1–2 (4th Cir. June 24, 2025) (per curiam) (unpublished) (same for four months). A plaintiff can rebut this conclusion by plausibly alleging that her employer's actions taken during the intervening period demonstrate retaliatory animus. See Barbour v. Garland, 105 F.4th 579, 593–600 (4th Cir. 2024); Massaro, 95 F.4th at 902–03; Alberti v. Rectors & Visitors of the Univ. of Va., 65 F.4th 151, 156 (4th Cir. 2023); Walton v. Harker, 33 F.4th 165, 177–78 (4th Cir. 2022); Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007); King, 328 F.3d at 151 n.5.

As for Donald's 2018 complaints, Donald cannot rely on those complaints because they occurred before September 8, 2018. Section 1981 claims are subject to a four-year statute of limitations. See Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 379–85 (2004); Chambers v. N.C. Dep't of Just., 66 F.4th 139, 141–43 (4th Cir. 2023) (holding that four-year statute of limitations applies to claims concerning post-contract formation conduct); 28 U.S.C. § 1658(a). In April 2018, Donald alleges Ross yelled at her, but admits that Ross did not yell at her because of her race. On July 3, 2018, Donald filed a formal complaint concerning Ross and Stiller. See DSMF ¶¶ 47–48. On September 8, 2022, Donald filed her first complaint in this court. See [D.E. 1]. Thus, Donald's section 1981 claim is time-barred to the extent it relies on conduct that occurred before September 8, 2018. See 28 U.S.C. § 1658(a).

Alternatively, even if the court were to consider Donald's 2018 complaints, Donald fails to demonstrate a genuine issue of material fact concerning her 2018 complaints. To show causation, Donald's retaliation claim "require[s] proof of a decisionmaker's knowledge of protected activity." See McIver v. Bridgestone Ams., Inc., 42 F.4th 398, 412 (4th Cir. 2022) (quotation omitted); Roberts, 998 F.3d at 124. "[I]f [an employee] fails to tie complaints about workplace conduct to her protected status, the employer could not have retaliated for engaging in a protected activity." McIver, 42 F.4th at 412; see Roberts, 998 F.3d at 124; Landino v. Sapp, 520 F. App'x 195, 198–99 (4th Cir. 2013) (per curiam) (unpublished). Donald, however, did not inform anyone at Novant that she considered Ross and Stiller's 2018 conduct to be race related. See DSMF ¶¶ 40–42; Donald Dep. 49; [D.E. 89-1] 155–57. Thus, defendants are entitled to summary judgment on count one to the extent Donald's claims rely on Donald's 2018 complaints.

As for Donald's retaliation claim based on Stiller's April 2020 email, the court assumes without deciding that Donald engaged in protected activity when she reported Stiller's email. Moreover, eliminating Donald's position and defendants' failure to hire Donald for the PMC AP Lab Supervisor position are adverse employment actions. See, e.g., Barbour, 105 F.4th at 590–91; Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 577 (4th Cir. 2015); King, 328 F.3d at 151 n.5; Templeton v. First Tennessee Bank, N.A., 424 F. App'x 249, 251 (4th Cir. 2011) (per curiam) (unpublished). Donald has not, however, produced sufficient evidence of causation. The nearly three-month gap between Donald's alleged protected activity and her position's elimination, and the approximately seven-month gap between the alleged protected activity and Pavelik's hire, do not create a genuine issue of material fact about causation. See Breeden, 532 U.S. at 274; Barnhill, 138 F.4th at 132–35; Cosby, 93 F.4th at 721–22; Massaro, 95 F.4th at 902; Roberts, 998 F.3d at 126; Penley, 876 F.3d at 656; Causey, 162 F.3d at 803; Dowe, 145 F.3d at 657; Perry v. Kappos,

489 F. App'x 637, 643 (4th Cir. 2012) (unpublished).

As for Donald's failure to hire claim, Donald cannot demonstrate the relevant decisionmakers who decided to hire Pavelik knew of her complaint about Stiller's email. See McIver, 42 F.4th at 412; Roberts, 998 F.3d at 125. This fact dooms her claim. Furthermore, Donald presents no evidence of intervening retaliatory animus in the period between her complaint about Stiller's email and the adverse employment actions. Thus, Donald fails to establish a prima facie case of retaliation.

Alternatively, even if Donald established a prima facie case of retaliation, no genuine issue of material fact exists about pretext. As for the elimination of Donald's position, Novant had legitimate, nonretaliatory reasons for eliminating the AP Lab Supervisor position: the AP Lab's decreased workload and the ease with which it could shift Donald's responsibilities to other employees. In opposition to this conclusion, Donald argues that Novant's justifications are false because (1) volumes were high from 2017 to 2019; (2) Donald's applications for other positions were motivated by a desire to escape a hostile work environment, not a decline in workload, and (3) when Novant terminated Donald's employment, Novant used overtime for other Novant employees and the AP Lab's overall productivity was 100.4 percent. See [D.E. 92] 14–16.

As for the alleged high volumes from 2017 to 2019, Novant terminated Donald in 2020 after the COVID pandemic and the closure of Ross's pathology practice caused case volumes to fall. High case volumes from 2017 to 2019 do not equal high case volumes in 2020.

As for Donald's alleged desire to escape a hostile work environment, Donald's only evidence comes from her declaration, which contradicts her deposition testimony. Compare [D.E. 92-1] ¶¶ 26–27, with Donald Dep. 21–22, 27; [D.E. 89-1] 188. At her deposition, Donald admitted that she was motivated to seek another job because of the declining workload at RMC. See Donald

18

Dep. 21–22, 27. The court disregards Donald's declaration to the extent that it contradicts her deposition testimony. See Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 806–07 (1999); In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011); Rohrborough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); Swindell v. CACI NSS, Inc., No. 5:17-CV-617, 2020 WL 5824024, at *3 n.3 (E.D.N.C. Sept. 30, 2020) (unpublished), aff'd, No. 20-2179, 2022 WL 3754531 (4th Cir. Aug. 30, 2022) (per curiam) (unpublished).

As for Donald's assertions about Novant paying overtime to some employees and the productivity rate at the AP Lab, the court examines whether Novant's reasons for terminating Donald were a pretext (i.e., a lie). The court does not examine whether Novant exercised sound business judgment in how it ran the AP Lab. See Wannamaker-Amos, 126 F.4th at 257; Villa, 858 F.3d at 901; Hawkins, 203 F.3d at 279; Williams v. Md. Dep't of Health, No. 22-1074, 2024 WL 2746979, at *4–5 (4th Cir. May 29, 2024) (per curiam) (unpublished); Nzabandora v. Rectors & Visitors of the Univ. of Va., 749 F. App'x 173, 177 (4th Cir. 2018) (per curiam) (unpublished). Donald's evidence fails to show that Novant's business justifications for eliminating her job were pretextual. Even viewing the record in the light most favorable to Donald, Donald fails to present evidence sufficient to create a genuine issue of material fact as to pretext.

As for Novant's decision to hire Pavelik, Novant had legitimate, nondiscriminatory reasons for hiring Pavelik. Pavelik had experience in histology, which complimented Montello's cytology background, and Pavelik had experience working a high-volume laboratory with Montello. See DSMF ¶¶ 225, 228–32. Again, Donald contests the factual basis of Novant's reasons. Even viewing the evidence in the light most favorable to Donald, no rational jury could find Novant's reasons for hiring Pavelik pretextual. See Holland v. Washington Homes, Inc., 487 F.3d 208, 215

19

(4th Cir. 2007); Laber v. Harvey, 438 F.3d 404, 431–32 (4th Cir. 2006) (en banc); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269–70 (4th Cir. 2005); Dugan v. Ablemarle Cnty. Sch. Bd., 293 F.3d 716, 722–23 (4th Cir. 2002). Moreover, Donald's own assessment that she was more qualified for the position fails to create a genuine issue of material fact about pretext. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); Cole v. Wake Cnty. Bd. of Educ., 494 F. Supp. 3d 338, 346 (E.D.N.C. 2020); Felton, 295 F. Supp. 3d at 604; Broadway v. United Parcel Serv., Inc., No. 5:16-CV-803, 2018 WL 542666, at *5 (E.D.N.C. Jan. 24, 2018) (unpublished). Thus, the court grants defendants' motion for summary judgment on Donald's section 1981 retaliation claim.

### 2.

In count two, Donald alleges race discrimination in violation of section 1981. See Am. Compl. ¶¶ 73–85. Donald lacks direct evidence of race discrimination and proceeds under the McDonnell Douglas framework.

As for Donald's race discrimination claim about Novant's elimination of her position, Donald must show that (1) she was a member of a protected class, (2) she suffered an adverse employment action, (3) she was fulfilling her employer's legitimate expectations at the time of the adverse action, and (4) she was treated differently than a similarly situated employee outside the protected class. See, e.g., Giles v. Nat'l R.R. Co., LLC, 59 F.4th 696, 703–04 (4th Cir. 2023); Goode v. Cent. Va. Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015), abrogated in part on other grounds by Bing v. Brivo Sys., LLC, 959 F.3d 605 (4th Cir. 2020); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Tahir v. Sessions, No. 5:16-CV-781, 2017 WL 1735158,

at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished). As for Donald's race discrimination claim based on Novant's decision to hire Pavelik, Donald must show: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [the defendant] rejected her application under circumstances that give rise to an inference of discrimination." Williams, 370 F.3d at 430; see McDonnell, 411 U.S. at 802; Anderson, 406 F.3d at 268; Henry v. Vaughn Indus., LLC, 450 F. Supp. 3d 671, 679 (E.D.N.C. 2020).

Under section 1981, a plaintiff also must show that her race was the "but for" cause of the interference with a contractual interest. Comcast Corp., 589 U.S. at 340–41; Lawrence v. DAP Prods., Inc., No. 23-2268, 2025 WL 1098841, at *2 (4th Cir. Apr. 14, 2025) (per curiam) (unpublished); Nadendla v. WakeMed, 24 F.4th 299, 303–05 (4th Cir. 2022); McKenzie-El v. Am. Sugar Refining, Inc., No. 21-1089, 2021 WL5412341, at *2 (4th Cir. Nov. 19, 2021) (per curiam) (unpublished). But-for causation requires the plaintiff to "ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." Comcast Corp., 589 U.S. at 341; see Lawrence, 2025 WL 1098841, at *2.

In support of her race discrimination claim about Novant's elimination of her job, Donald essentially argues that Stiller's email created a hostile work environment. See [D.E. 92] 16–20. The court, however, already denied Donald's motion to amend her complaint to add a hostile work environment claim under section 1981. See [D.E. 39] 6–9. Donald cannot use her opposition to summary judgment to amend her complaint. See, e.g., U.S. ex rel. Carter v. Halliburton Co., 866 F.3d 199, 210 n.6 (4th Cir. 2017); Murray Energy Corp. v. Adm'r of EPA, 861 F.3d 529, 537 n.5 (4th Cir. 2017); vonRosenberg v. Lawrence, 849 F.3d 163, 167 n.1 (4th Cir. 2017); S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184–85

(4th Cir. 2013); see also Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009); Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009); United States ex rel. Graybar Elec. Co., Inc. v. TEAM Constr., LLC, 275 F. Supp. 3d 737, 748 n.3 (E.D.N.C. 2017); Shinaberry v. Town of Murfreesboro, No. 2:17-CV-7, 2019 WL 5446712, at *5 n.4 (E.D.N.C. Oct. 23, 2019) (unpublished); Optima Tobacco Corp. v. U.S. Flue-Cured Tobacco Growers, Inc., No. 5:16-CV-889, 2019 WL 4858848, at *7 (E.D.N.C. Sept. 30, 2019) (unpublished). Thus, the court ignores Donald's arguments to the extent they mimic her failed hostile work environment claim. See [D.E. 39] 6–9.

Donald does not present any other evidence of race discrimination concerning Novant's decision to eliminate Donald's position or its decision to hire Pavelik. Specifically, Donald does not present any evidence that creates an inference of race discrimination in Novant's decision to eliminate her position or Novant's later decision to hire Pavelik for a different position. See, e.g., Swaso v. Onslow Cnty. Bd. of Educ., 698 F. App'x 745, 748–49 (4th Cir. 2017) (unpublished). Thus, the court grants defendants' motion for summary judgment on Donald's race discrimination claim.

Alternatively, even if the court were to assume that Donald established a prima facie case of race discrimination, no genuine issue of material fact exists about pretext. As discussed, Novant has demonstrated legitimate, nondiscriminatory reasons for eliminating Donald's position and terminating her employment, and for its decision to hire Pavelik for a different position. Thus, the burden shifts to Donald to demonstrate that there is a genuine issue of material fact about pretext. As explained, no rational jury could find that Novant's reasons for eliminating Donald's position and terminating Donald or its decision to hire Pavelik were pretextual. Thus, even if Donald could establish a prima facie case of race discrimination, defendants are entitled to summary judgment

22

on Donald's race discrimination claim.

B.

In count three, Donald alleges that Novant discriminated against her because of her age when it hired Pavelik. To establish a prima facie case of discriminatory failure to hire, Donald must show: "(1) [she] was a member of a protected class, i.e., that [she] was at least 40 years old; (2) [the] employer had an open position for which [she] applied and was qualified; (3) [she] was rejected despite [her] qualifications; and (4) the position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff, whether within or outside the class protected by the ADEA." Laber, 438 F.3d at 430; see, e.g., Westmoreland v. TWC Admin., LLC, 924 F.3d 718, 725–26 (4th Cir. 2019); Walsh v. Ciba-Geigy Corp., 121 F.3d 702, 1997 WL 538006, *1–2 (4th Cir. 1997) (per curiam) (unpublished table decision). The McDonnell Douglas framework applies to ADEA age discrimination claims. See, e.g., Massaro, 95 F.4th at 901–02; Bandy v. City of Salem, 59 F.4th 705, 712 & n.3 (4th Cir. 2023); Westmoreland, 924 F.3d at 725; Smith, 618 F.2d at 1066 & n.3.

The court assumes without deciding that Donald has established a prima facie case of age discrimination. As explained, Novant had legitimate, nondiscriminatory reasons for selecting Pavelik, and no genuine issue of material fact exists about pretext. Thus, the court grants defendants' motion for summary judgment on Donald's age discrimination claim.

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 87] and DENIES AS MOOT the parties' remaining outstanding motions [D.E. 99, 102, 104, 111]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

23

SO ORDERED.   This __19__ day of September, 2025.

_____
JAMES C. DEVER III
United States District Judge

24